J-S37027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OMAR ROBINSON | : | |
| | : | |
| Appellant | : | No. 497 EDA 2021 |

Appeal from the PCRA Order Entered January 27, 2021
In the Court of Common Pleas of Northampton County
Criminal Division at No. CP-48-CR-0001347-2015

BEFORE: PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.: **FILED JANUARY 10, 2022**

Omar Robinson (Appellant) appeals *pro se* from the order dismissing his

first petition seeking relief pursuant to the Post Conviction Relief Act (PCRA).

***See*** 42 Pa.C.S.A. §§ 9541-9546. We affirm.

This Court previously detailed the case history as follows:

> On November 23, 2012, the narcotics division of the Easton
> Police Department was involved in an ongoing investigation
> targeting the home of Corey Reavis [(Reavis)]. That day, officers
> conducted a controlled purchase of heroin from Patrick Hughes
> [(Hughes)] using a confidential informant. Police officers
> observed Hughes leave Reavis's home, walk to the informant,
> engage in a brief hand-to-hand transaction, and return to Reavis's
> home. When Hughes returned to Reavis's home, police observed
> Hughes interact with individuals on the front porch, including
> Appellant. Police took photographs of Appellant, Hughes, and the
> transaction. Police also observed Appellant's minivan parked
> outside the residence.

---

[*] Former Justice specially assigned to the Superior Court.

Later that day, Appellant and Hughes shot and killed Ervin Holton ("Victim") in Easton.[2]  A witness who was driving near the scene called 911 to report the shooting.  She stated that, after hearing the gunshots, she saw two individuals in dark clothing running toward a nearby minivan.  The Victim died from multiple gunshot wounds; ballistics evidence confirmed that there were two shooters.

> [2] The Victim and Hughes were rival drug dealers and may have been in a dispute about Nicole Greene [(Greene)], the woman they both dated.  N.T. Trial, 1/10/17, at 31-32.

During the subsequent investigation, detectives from the Easton Police Department obtained consistent surveillance video that showed two individuals exit a minivan one block from the crime scene, walk towards the location of the shooting, and shortly thereafter, run back towards the minivan and drive away.  Police officers also learned that Appellant's girlfriend, Lisa Doorley [(Doorley)], owned the minivan.

When police officers located the minivan at Appellant's home, which he shared with Doorley, Appellant confirmed that only he and Doorley drive the minivan, and that he did not allow anyone else to drive the minivan.  Upon confirming that he had been driving the minivan on the night of the murder, Appellant started crying.  Police searched the minivan with Doorley's consent and found gunshot residue on the steering wheel and the driver's side interior door handle.

Homicide detectives also learned that Appellant and Hughes had spent much of the day together before the murder.  Reavis confirmed that he had been hanging out with Appellant and Hughes that day.  Reavis admitted that he had driven and dropped off the Victim at a store near the scene of the murder shortly before Appellant and Hughes murdered him.

Also, cell phone records from Appellant and Hughes confirmed their whereabouts in south Easton, where the shooting occurred, and their close proximity to the area and each other when they placed the calls.  The eyewitness called 911 at 5:39 P.M., and the cell phone records showed that Appellant and Hughes made numerous calls to Reavis before and after the

murder. All calls stopped at the precise time of the shooting, consistent with the surveillance video.

During the investigation, Hughes provided several different, inconsistent, and unsubstantiated alibis to police investigators. After his arrest, Hughes made several incriminating statements to fellow inmates (1) regarding his motive for the murder, and (2) claiming that he and his men were responsible for the murder.

Thereafter, the Commonwealth charged Appellant with Criminal Homicide and Criminal Conspiracy. In October 2015, the trial court granted the Commonwealth's Motion to try Appellant and Hughes jointly[, after having denied Appellant's pretrial motion to sever].

* * *

In January 2017, Appellant and Hughes proceeded to an eight-day jury trial. . . .

The Commonwealth presented testimony from numerous witnesses, including Reavis, Greene, the Northampton County coroner, and numerous detectives and police officers. Appellant and Hughes did not testify and presented no evidence.

On January 20, 2017, the jury convicted Appellant of First-Degree Murder and Criminal Conspiracy. On February 28, 2017, the trial court sentenced Appellant to life imprisonment without parole. Appellant filed a timely Post-Sentence Motion, which the trial court denied on August 4, 2017.

***Commonwealth v. Robinson***, 216 A.3d 343 (Pa. Super. 2019) (unpublished memorandum at **1-6) (footnote 2 in original, remaining footnotes omitted).

On direct appeal, Appellant was represented by Attorney James Brose (Attorney Brose or direct appeal counsel). This Court affirmed the judgment of sentence, rejecting Appellant's claims that the trial court erred in: (1) admitting evidence that Appellant was present at a drug transaction shortly before the murder; and (2) failing to declare a mistrial after the prosecutor

identified Appellant as a drug dealer in the opening statement. ***See id.*** at **6-13. The Pennsylvania Supreme Court denied allowance of appeal. ***Commonwealth v. Robinson***, 217 A.3d 788 (Pa. 2019) (Table).

On April 30, 2020, Appellant filed a timely *pro se* PCRA petition raising several claims of ineffectiveness of trial counsel, Liam Riley, Esquire (Attorney Riley or trial counsel), and direct appeal counsel. The PCRA court appointed Talia Mazza, Esquire (PCRA counsel), who filed an amended PCRA petition on October 20, 2020, raising five claims of ineffectiveness of counsel. The first claim alleged trial counsel was ineffective for failing to file a supplemental brief raising issues pertinent to Appellant's pretrial motion for severance. ***See*** Amended PCRA Petition, 10/20/20, at ¶¶ 10-11 ("At a hearing on the merits for [Appellant's] Motion for Severance, [the trial court] asked that [trial] counsel file a supplemental brief regarding [Appellant's] legal basis for asking for severance. No supplemental brief was ever filed. The Court denied [the] Motion for Severance."). The PCRA court summarized Appellant's remaining four claims, which alleged ineffectiveness of direct appeal counsel:

> 1) that Attorney Brose failed to advance on appeal a sufficiency of the evidence claim[;] 2) that Attorney Brose failed to advance on appeal [the trial c]ourt's denial of Appellant's Motion for Severance[;] 3) that Attorney Brose failed to advance on appeal a prosecutorial misconduct claim due to the Assistant District Attorney's closing argument in which the Assistant District Attorney stated that Appellant was "caught in a lie" to a detective regarding his location during the murder; and 4) that Attorney Brose failed to advance on appeal a claim relative to [the trial court's] ruling that a 911 call, identifying a Honda Odyssey as being present at the crime scene, was admissible evidence.

PCRA Court Opinion, 4/30/21, at 4-5.

The PCRA court conducted an evidentiary hearing on November 23, 2020, at which Appellant, trial counsel, and direct appeal counsel testified. PCRA counsel subsequently filed a "no-merit" letter and motion to withdraw as counsel, pursuant to **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988), and **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*), asserting that all of Appellant's issues were frivolous and no meritorious claims existed.

By order entered January 27, 2021, the PCRA court dismissed Appellant's petition and granted PCRA counsel leave to withdraw.[1] On February 25, 2021, Appellant filed two *pro se* documents (collectively, "objections"), respectively titled "Objection to PCRA Court's Notice Pursuant to Pa.R.Crim.P. 907 of Intention to Dismiss," and "Objections to PCRA Attorney's 'No-Merit' Brief Letter." In the objections, Appellant argued, *inter*

_____

[1] An indigent PCRA petitioner is entitled to appointment of counsel during litigation of a first PCRA petition, including any appeal. **See** Pa.R.Crim.P. 904(C), (F)(2) (PCRA court must appoint counsel to represent indigent defendant during litigation of first PCRA petition; the appointment is effective throughout collateral proceedings, including any appeal from denial of PCRA petition). However, where the PCRA court accepts a **Turner**/**Finley** no-merit letter and permits counsel to withdraw, the petitioner is not entitled to the appointment of new PCRA counsel, and he or she must retain private counsel or proceed *pro se* in future proceedings. **See Commonwealth v. Rykard**, 55 A.3d 1177, 1183 n.1 (Pa. Super. 2012); **Commonwealth v. Maple**, 559 A.2d 953, 958 (Pa. Super. 1989) (where appointed PCRA counsel has been permitted to withdraw pursuant to **Turner**/**Finley**, the appointment of new counsel is unnecessary and improper).

- 5 -

*alia*, that PCRA counsel was ineffective for (1) failing to address all of the issues Appellant raised in his *pro se* PCRA petition; and (2) petitioning to withdraw as counsel without conducting a diligent review of Appellant's claims.[2] The PCRA court denied the objections, concluding they were "moot and procedurally improper." Order, 3/3/21 (footnote omitted).

Appellant timely filed a *pro se* notice of appeal,[3] followed by a court-ordered Pa.R.A.P. 1925(b) statement. On April 30, 2021, the Honorable Jennifer R. Sletvold, sitting as the PCRA court, issued a comprehensive 31-page opinion addressing the ten errors alleged by Appellant in the Rule 1925(b) statement. Appellant has abandoned the tenth issue in his appellate brief; Appellant presents nine issues:

1. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim of criminal homicide, where the Commonwealth failed to present sufficient evidence to identify the Appellant as the perpetrator of this homicide beyond a reasonable doubt.

2. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim of criminal conspiracy to

---

[2] Recently, in **Commonwealth v. Bradley**, 261 A.3d 381 (Pa. 2021), the Pennsylvania Supreme Court held, "a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." **Id.** at 401 (footnote omitted).

[3] Appellant was not served with a copy of the January 27, 2021 dismissal order until February 5, 2021. Appellant timely filed his notice of appeal on March 1, 2021. **See** Pa.R.A.P. 108(a)(1) (computation of appeal period begins on the date the clerk of court "mails or delivers copies of the order to the parties"); Pa.R.A.P. 903(a) (30-day appeal period); **see also Commonwealth v. Jones**, 700 A.2d 423, 426 (Pa. 1997) (explaining "prisoner mailbox rule").

commit homicide, where the Commonwealth failed to establish beyond a reasonable doubt, the existence of a conspiratorial agreement.

3. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim that the redaction of the non-testif[y]ing co-defendant's statement and confession, along with statements by the prosecutor in closing arguments, was insufficient to preclude the jury's inference that the Appellant was the co-conspirator in violation of ***Bruton v United States***, 391 U.S. 123, 88 S.Ct. 1620 L.Ed.2d. 476 (1968). 1/13/17 at pg 91, 1/17/17 at pg 92, 1/13/17 at 178, and 1/19/17 at pg 66, 69, 87-88.

4. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim that trial counsel was ineffective for failure to argue and file supplement brief in support of Motion for Severance.

5. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim that the Appellant's Sixth Amendment Confrontation Clause rights were violated by not allowing the Appellant to cross-examine Mr. Sandt as to his identification of what he believed to be a Honda Odyssey, on the night of the homicide.

6. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim that trial court erred in failing to grant a mistrial on prosecutorial misconduct, when the prosecutor['s] reference to unrelated infamous crimes, Boston bomber 1/19/17 at pg 73, and the O.J. Simpson Case 1/19/17 at pg 71.

7. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim that trial court erred in failing to grant a mistrial on prosecutorial misconduct when prosecutor expressed his personal belief [Appellant] "gets caught in a lie," 1/19/17 at pg 83.

8. Whether direct appeal counsel and PCRA counsel w[ere] ineffective for failure to advance claim that trial court erred in failing to grant a mistrial on prosecutorial misconduct when prosecutor repeatedly made misstatements of the facts as to

the Appellant's alleged confession stating that he said "I really wasn't out there." 1/19/17 at pg 83,85.

9. Whether PCRA court and PCRA counsel failed to comply with the requirements of **Turner**/**Finley** prior to counsel's "No-Merit brief letter," and Motion to Withdraw, and PCRA court's order to dismiss, when PCRA counsel failed to add claim 5, 6 in original PCRA petition 4/30/20 at pg 55-57, and 58-60.

Appellant's Brief at 4-5.[4]

Our review of Appellant's issues,

is limited to the examination of whether the PCRA court's determination is supported by the record and free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding.

**Commonwealth v. Maxwell**, 232 A.3d 739, 744 (Pa. Super. 2020) (*en banc*)

(citations omitted). We review the PCRA court's decision for an abuse of

discretion. **Commonwealth v. Roney**, 79 A.3d 595, 603 (Pa. 2013).

Further,

[w]e view the evidence of record in a light most favorable to the Commonwealth, as the prevailing party below. We are bound by the PCRA court's credibility determinations, unless those determinations are not supported by the record; however, we review the PCRA court's legal conclusions *de novo.*

**Commonwealth v. Flor**, 259 A.3d 891, 902 (Pa. 2021) (citations omitted).

---

[4] As we discuss below, these 9 issues differ from the issues raised in the Rule 1925(b) Statement.

Preliminarily, we note that Appellant's *pro se* brief (excluding tables and appendices) is 80 pages long and does not contain a word count. Pursuant to Pa.R.A.P. 2135, a principal brief is limited to 14,000 words; when the brief exceeds 30 pages, the appellant must certify with the appellate court that the brief complies with the word limitation. **See** Pa.R.A.P. 2135(a), (d). "The certification requirement is not limited to counsel: *Pro se* litigants, too, are obliged to provide a certification for a primary brief that exceeds thirty pages." **In re Delevie**, 204 A.3d 505, 510-11 (Pa. Super. 2019) (citations omitted). Here, Appellant's brief exceeds 14,000 words, and he has failed to file a certificate of compliance pursuant to Rule 2135. Moreover, in violation of Pa.R.A.P. 2111(a)(11), Appellant has failed to attach a copy of the Rule 1925(b) statement. While we construe *pro se* filings liberally, we remind Appellant that *pro se* litigants must comply substantially with our rules of procedure, and "*pro se* status confers no special benefit[.]" **Commonwealth v. Blakeney**, 108 A.3d 739, 766 (Pa. 2014); **see also In re Delevie**, 204 A.3d at 511 (same). However, as the brief does not hamper our review, we consider the merits of Appellant's claims.

We address Appellant's first two issues together, where Appellant argues direct appeal counsel was ineffective for failing to raise a challenge to the sufficiency of the evidence supporting his convictions, and PCRA counsel was ineffective for failing to raise the issue of direct appeal counsel's ineffectiveness in this regard. **See** Appellant's Brief at 10-32.

To be entitled to relief based on a claim of ineffective assistance of counsel, a PCRA petitioner must establish that: (1) the underlying claim is of arguable merit; (2) there was no reasonable basis for counsel's action or failure to act; and (3) but for counsel's error, there is a "reasonable probability the result of the proceeding would have been different." *Commonwealth v. Treiber*, 121 A.3d 435, 444 (Pa. 2015). Failure to satisfy any of the three prongs is fatal to a claim of ineffective assistance of counsel. *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). Counsel is presumed to provide effective assistance, and it is the petitioner's burden to advance sufficient evidence to overcome this presumption. *Commonwealth v. Johnson*, 139 A.3d 1257, 1272 (Pa. 2016). "Finally, counsel cannot be deemed ineffective for failing to raise a meritless claim." *Id.* (citation omitted).

Appellant argues the evidence failed to establish his identity as a perpetrator. *See* Appellant's Brief at 14 ("The eyewitnesses in this case provided no evidentiary value, when it comes to identifying the two [perpetrators] in this case."), 20 ("The scientific analysis did not reveal any evidentiary evidence as it relates to the identification of the unknown alleged suspected shooters."). Appellant further asserts the Commonwealth "failed to present any testimonial evidence, direct, and/or circumstantial evidence that the Appellant conspired to commit this crime, other than association with the [co]defendant in this case," *i.e.*, Hughes. *Id.* at 29.

In his Rule 1925(b) statement, Appellant did not claim that direct appeal counsel and/or PCRA counsel was ineffective with respect to sufficiency of the evidence. Rather, he solely challenged the sufficiency of the evidence supporting his convictions, which is distinct from an ineffectiveness claim. *See* Rule 1925(b) statement, 3/29/21, at 1 (unnumbered); *see also* PCRA Court Opinion, 4/30/21, at 9 n.6 (noting Appellant's claims in the 1925(b) statement challenged "the sufficiency of the evidence and [are] not claims of ineffective assistance of counsel by, for example, failing to timely raise such claims on appeal."); *Commonwealth v. Bond*, 819 A.2d 33, 40 (Pa. 2002) (a PCRA petitioner must pursue a distinct ineffectiveness claim to circumvent waiver of underlying claim of trial court error that could have been previously litigated). Accordingly, Appellant waived his first two claims. *See Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011) (superseded on other grounds) ("any issues not raised in a Rule 1925(b) statement will be deemed waived"); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement … are waived"); *see also Hill*, *supra* ("the Rule's provisions are not subject to *ad hoc* exceptions or selective enforcement"); *Greater Erie Indus. Dev. Corp. v. Presque Isle Downs, Inc.*, 88 A.3d 222, 224 (Pa. Super. 2014) (*en*

*banc*) ("it is no longer within this Court's discretion to ignore the internal deficiencies of Rule 1925(b) statements."); **Bond**, **supra**.[5]

In his third issue, Appellant argues direct appeal counsel and PCRA counsel were ineffective for failing to challenge the admission at trial of an inculpatory statement made by his co-defendant, Hughes, in violation of **Bruton v. United States**, 391 U.S. 123 (1968). **See** Appellant's Brief at 33-41; **see also Bruton**, 391 U.S. at 135-37 (a confession from non-testifying co-defendant that directly incriminates defendant in a joint trial is of such a powerfully incriminating nature that an instruction to the jury limiting its consideration of the confession is insufficient to cure prejudice to defendant from the confession's admission at trial).

Again, Appellant failed to raise this ineffectiveness claim in his Rule 1925(b) statement; rather, he raised a general **Bruton** claim alleging trial court error. **See** Rule 1925(b) statement, 3/29/21, at 1 (unnumbered); **see also** PCRA Court Opinion, 4/30/21, at 14 ("it is unclear as to what Appellant is objecting. Appellant does not specify any statement of his co-

---

[5] Even if not waived, Appellant's ineffectiveness claims would not warrant relief, as there is no arguable merit to his sufficiency challenge. **Johnson**, **supra** (counsel cannot be deemed ineffective for failing to raise a meritless claim). **See also** PCRA Court Opinion, 4/30/21, at 8-14.

defendant[.]").  Accordingly, for the same reasons discussed above, Appellant waived this claim.  **See Hill**, **supra**; **Bond**, **supra**.[6]

Appellant next contends trial counsel was ineffective for failing to file a supplemental brief concerning the pretrial motion for severance.  **See** Appellant's Brief at 42-49.[7]  Appellant asserts trial counsel's failure caused him "to be tried along[]side of his co-defendant and convicted of first degree murder and conspiracy to commit murder, on evidence that could not be used against [] Appellant if he was tried alone."  **Id.** at 43.

The PCRA court, in its opinion, disposed of this claim by concluding trial counsel had a reasonable basis for not filing a supplemental brief on the severance issue.  **See** PCRA Court Opinion, 4/30/21, at 17-21.  Our review discloses that the PCRA court's analysis is supported by the record and the law, and we agree with its conclusion.  We therefore adopt the PCRA court's reasoning as our own.  **See id.**

---

[6] Even if not waived, Appellant's ineffectiveness challenge would not warrant relief, as there is no arguable merit to an underlying **Bruton** challenge.  **See Johnson**, **supra**.  In reaching this conclusion, we rely on the PCRA court's reasoning.  **See** PCRA Court Opinion, 4/30/21, at 14-16.

[7] To the extent Appellant argues direct appeal counsel and PCRA counsel were ineffective in this regard, the claim is waived because Appellant did not raise it with the PCRA court in his PCRA petition, Rule 1925(b) statement, or otherwise.  **See** Pa.R.A.P. 302(a) (issues cannot be raised for the first time on appeal); **Commonwealth v. Washington**, 927 A.2d 586, 601 (Pa. 2007) ("Any claim not raised in the PCRA petition is waived and not cognizable on appeal."); **Hill**, **supra**.

- 13 -

In his fifth issue, Appellant argues the PCRA court erred in failing to find that direct appeal counsel and/or PCRA counsel were ineffective for failing to advance a claim regarding the allegedly improper admission of an eyewitness 911 call at trial, in violation Appellant's right to confrontation. *See* Appellant's Brief at 50-60.

Appellant waived this ineffectiveness claim because he did not raise it in his Rule 1925(b) statement or PCRA petition (Appellant alleged only trial court error in admitting evidence violating his Sixth Amendment Confrontation Clause rights). *See* Rule 1925(b) statement, 3/29/21, at 2 (unnumbered); *Hill*, *supra*; *Bond*, *supra*; *see also* PCRA Court Opinion, 4/30/21, at 21 ("in Appellant's Amended PCRA Petition, Appellant raised a claim of ineffective assistance of counsel against his [direct appeal] counsel, Attorney Brose, for failing to advance on appeal the ruling of **admissible hearsay** regarding the 911 call. However, Appellant's issue as presented in the instant appeal is not an ineffective assistance of counsel claim, but appears to solely allege an error on behalf of the [trial c]ourt." (emphasis added)).[8]

We next address together Appellant's issues numbered 6 – 8. Appellant contends the PCRA court erred by failing to find direct appeal counsel ineffective for not raising a claim of prosecutorial misconduct related to the

---

[8] Even if not waived, Appellant's ineffectiveness challenge would not warrant relief, as there is no arguable merit to his underlying Confrontation Clause challenge. *See Johnson*, *supra*. In reaching this conclusion, we rely on the PCRA court's sound reasoning. *See* PCRA Court Opinion, 4/30/21, at 21-24.

- 14 -

prosecutor's: (a) improper reference to unrelated "infamous crimes" in closing argument; (b) reference in closing to Appellant getting "caught in a lie"; and (c) misstatements of fact in closing regarding Appellant's alleged confession. *See* Appellant's Brief at 61-71.[9]

Appellant did not raise these ineffectiveness claims in his Rule 1925(b) statement. Rather, he asserted claims of **trial court error** in failing to grant a mistrial based on prosecutorial misconduct in closing argument. *See* Rule 1925(b) statement, 3/29/21, at 2 (unnumbered). Thus, we again find waiver. *See Hill*, *supra*; Pa.R.A.P. 1925(b)(4)(vii); *see also Satiro v. Maninno*, 237 A.3d 1145, 1150 (Pa. Super. 2020) ("Even if the trial court correctly guesses the issues [a]ppellant raises on appeal and writes an opinion pursuant to that supposition the issues are still waived.") (citation and brackets omitted).[10]

In his final issue, Appellant argues the PCRA court erred in dismissing his petition where PCRA counsel rendered ineffective assistance, and violated the requirements of *Turner*/*Finley*, *supra*, based on her failure to address in her "no-merit" letter two issues which Appellant raised in his *pro se* PCRA petition (*i.e.*, claims of prosecutorial misconduct for misstating facts during closing argument and improperly referencing unrelated "infamous cases").

---

[9] Appellant also argues PCRA counsel was ineffective for failing to assert direct appeal counsel's ineffectiveness in relation to these claims. *See* Appellant's Brief at 61, 65, 68.

[10] In the absence of waiver, these claims lack merit such that no relief would be due. *See Johnson*, *supra*; PCRA Court Opinion, 4/30/21, at 24-29.

*See* Appellant's Brief at 77-79; *see also id.* at 78 (asserting PCRA counsel "failed to conduct a thorough review of the case prior to making a determination that all issues raised by [Appellant] had been addressed prior to" filing the no-merit letter).[11]

The Commonwealth responds:

In her no-merit letter, PCRA counsel addressed two of Appellant's three prosecutorial misconduct claims; specifically, that the prosecutor stated Appellant was caught in a lie and that the prosecutor allegedly misstated facts in his closing argument. Appellant appears to be correct that PCRA counsel did not address his third prosecutorial misconduct claim, related to the prosecutor's reference to other infamous cases, in her no-merit letter. However, . . . there is no prejudice to Appellant based on this omission by counsel[, *i.e.*, in light of the PCRA court's above-mentioned rejection of this meritless claim (which Appellant raised in issue number 6)].

Commonwealth Brief at 35-36 (citations omitted).

We agree that this ineffectiveness claim fails. *See Johnson*, *supra* (counsel cannot be deemed ineffective for failing to raise a meritless claim); *Treiber*, *supra* (to prevail on an ineffectiveness claim, a petitioner must prove, *inter alia*, prejudice); *see also* PCRA Court Opinion, 4/30/21, at 30 ("even if Appellant's PCRA counsel had litigated [the ineffectiveness claims related to prosecutorial misconduct,] the claims appurtenant to them would

_____

[11] Appellant repeats several claims of ineffectiveness of direct appeal counsel and trial counsel that he raised in his prior issues. *See* Appellant's Brief at 73-76. Since we have already rejected these claims, we do not address them further.

have been dismissed because they lack merit." (footnote and some capitalization omitted)).

Finally, we address Appellant's three *pro se* motions filed with this Court. On December 2, 2021, Appellant filed a "Motion for Extension of Time to File Response to Appellee Brief" (motion for extension). The next day, he filed a "Motion to Compel Original Response Brief Transcripts by the Commonwealth and Original Concise Statements of the Matter by Appellant" (motion to compel). In sum, Appellant claimed the Commonwealth prejudiced him and caused undue delay by intentionally and improperly mailing the Commonwealth's Appellee Brief to the Pennsylvania Department of Corrections' (DOC) central mail processing center in Florida, instead of sending it to the state prison where Appellant is incarcerated. Also, on December 10, 2021, Appellant filed a "Motion for Stay on Petition for Review Pending Reply to Appellee's Brief" (motion for stay), in which he again raised the same claim of Commonwealth impropriety.

The Commonwealth has responded,

Pursuant to DC-ADM 803(1)(A)(4), the only mail permitted to be sent directly to a state correctional institution is "privileged incoming correspondence." "Privileged incoming correspondence" is defined as "mail from an inmate's attorney," "mail from a court," or mail from an elected official that "involves matters related to a confidential investigation process or similar concerns." All other mail must be sent to the [DOC's] central mail processing center at Smart Communications/PA DOC, P.O. Box 33028, St. Petersburg, Florida 33733. Pursuant to DC-ADM 803(1)(B)(1), "non-privileged correspondence that is sent to a prison instead of the [DOC's] contracted central mail processing center" will be refused. Any document that the Commonwealth sends to

> Appellant, including its Appellee's Brief, is non-privileged inmate correspondence because there is no attorney-client relationship between the District Attorney's Office and Appellant. As such, the Commonwealth cannot send mail directly to the prison where Appellant is housed because it is not a privileged correspondence, as confirmed by an email from an attorney for the [DOC].

Response in Opposition, 12/9/21, at 2-3 (paragraph numbering and citations to attached exhibits omitted). The Commonwealth is correct. Therefore, we deny Appellant's motions.

For the reasons discussed above, Appellant is not entitled to post-conviction relief. We therefore affirm the PCRA court's dismissal of Appellant's petition, relying in part on the PCRA court's well-reasoned analysis. Accordingly, the parties shall attach a copy of the April 30, 2021 opinion authored by Judge Sletvold, sitting as the PCRA court, in the event of future proceeds relevant to this matter.

Order affirmed. Motion for extension denied. Motion to compel denied. Motion for stay denied. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/10/2022

- 18 -

**IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY**
**COMMONWEALTH OF PENNSYLVANIA**
**CRIMINAL DIVISION**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : |
| | : |
| | :     **No. 497 EDA 2021** |
| v. | :     **Trial Court No.: CR-1347-2015** |
| | : |
| OMAR ROBINSON | : |
| | : |
| Defendant. | : |

**MEMORANDUM OPINION**

**I.    Factual and Procedural History**

This Memorandum Opinion is filed in accordance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. Following an eight-day jury trial before the undersigned judge, the Appellant, Omar Robinson (hereinafter, "Appellant"), was found guilty of criminal homicide as murder of the first degree, in violation of 18 Pa.C.S.A. § 2501; and criminal conspiracy to commit murder of the first degree, in violation of 18 Pa.C.S.A. § 903 A1. These crimes arose out of Appellant's role in the shooting death of Ervin Holton (hereinafter, "Holton") on November 23, 2012 in the City of Easton, Pennsylvania.

For purposes of trial, Appellant's criminal information was joined with the criminal information of Patrick Hughes (hereinafter "Hughes"), who was charged with Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501[1] and Criminal Conspiracy to Commit Criminal Homicide, in violation of 18 Pa.C.S.A. § 903 A1. Both Appellant and Hughes were convicted as charged.

This Court sentenced Appellant on February 28, 2017 as follows: 1) for the charge of murder in the first degree, to serve a term of life imprisonment without the possibility of parole in a

---

[1] Hughes was charged with Criminal Homicide for soliciting Appellant to commit the criminal homicide and/or aiding, agreeing, or attempting to aid Appellant in planning or committing same.

1



Pennsylvania state correctional institution; and 2) for the charge of criminal conspiracy to commit

criminal homicide as murder in the first degree, to a concurrent period of incarceration of twenty (20)

to forty (40) years in a Pennsylvania state correctional institution.

At trial, Appellant was represented by Attorney Liam Riley, who was privately retained as

counsel. Post-trial, and subsequent to the timely filing of a post-trial motion on behalf of Appellant,[2]

Attorney Riley filed a petition to withdraw as counsel and requested this Court to appoint new counsel

for Appellant. Following a conference that took place on May 5, 2017, this Court entered an Order

allowing Attorney Riley to withdraw as counsel. By Order of Court dated May 18, 2017, we appointed

James F. Brose, Esquire to represent Appellant on appeal.

We denied Appellant's post-trial motion on August 4, 2017. Appellant filed a counseled direct

appeal. This Court authored an Opinion in accordance with Rule 1925(a) of the Pennsylvania Rules

of Appellate Procedure, which was filed on October 16, 2017. Ultimately, on April 2, 2019, the

Pennsylvania Superior Court affirmed the Judgment of Sentence. Appellant filed a petition for

allowance of appeal with the Pennsylvania Supreme Court, which was denied.

For background purposes, the relevant facts of the case, as stated by the Pennsylvania Superior

Court in the Opinion affirming sentence, are as follows:

> On November 23, 2012, the narcotics division of the Easton Police Department was
> involved in an ongoing investigation targeting the home of Corey Reavis. That day,
> officers conducted a controlled purchase of heroin from Patrick Hughes using a
> confidential informant. Police officers observed Hughes leave Reavis's home, walk
> to the informant, engage in a brief hand-to-hand transaction, and return to Reavis's
> home. When Hughes returned to Reavis's home, police observed Hughes interact
> with individuals on the front porch, including Appellant. Police took photographs
> of Appellant, Hughes, and the transaction. Police also observed Appellant's minivan
> parked outside the residence.
>
> Later that day, Appellant and Hughes shot and killed Ervin Holton ("Victim") in
> Easton. A witness who was driving near the scene called 911 to report the shooting.
> She stated that, after hearing the gunshots, she saw two individuals in dark clothing

---

[2] On March 9, 2017, Appellant filed a post-sentence motion, entitled "Motion for a New Trial." Within this Motion, Appellant raised several bases for his request for a new trial.

running toward a nearby minivan. The Victim died from multiple gunshot wounds; ballistics evidence confirmed that there were two shooters.

During the subsequent investigation, detectives from the Easton Police Department obtained consistent surveillance video that showed two individuals exit a minivan one block from the crime scene, walk towards the location of the shooting, and shortly thereafter, run back towards the minivan and drive away. Police officers also learned that Appellant's girlfriend, Lisa Doorley, owned the minivan.

When police officers located the minivan at Appellant's home, which he shared with Doorley, Appellant confirmed that only he and Doorley drive the minivan, and that he did not allow anyone else to drive the minivan. Upon confirming that he had been driving the minivan on the night of the murder, Appellant started crying. Police searched the minivan with Doorley's consent and found gunshot residue on the steering wheel and the driver's side interior door handle.

Homicide detectives also learned that Appellant and Hughes had spent much of the day together before the murder. Reavis confirmed that he had been hanging out with Appellant and Hughes that day. Reavis admitted that he had driven and dropped off the Victim at a store near the scene of the murder shortly before Appellant and Hughes murdered him.

Also, cell phone records from Appellant and Hughes confirmed their whereabouts in south Easton, where the shooting occurred, and their close proximity to the area and each other when they placed the calls. The eyewitness called 911 at 5:39 P.M., and the cell phone records showed that Appellant and Hughes made numerous calls to Reavis before and after the murder. All calls stopped at the precise time of the shooting, consistent with the surveillance video.

During the investigation, Hughes provided several different, inconsistent, and unsubstantiated alibis to police investigators. After his arrest, Hughes made several incriminating statements to fellow inmates (1) regarding his motive for the murder, and (2) claiming that he and his men were responsible for the murder.

Thereafter, the Commonwealth charged Appellant with Criminal Homicide and Criminal Conspiracy. In October 2015, the trial court granted the Commonwealth's Motion to try Appellant and Hughes jointly.

. . .

In January 2017, Appellant and Hughes proceeded to an eight-day jury trial. ...

The Commonwealth presented testimony from numerous witnesses, including Reavis, Greene, the Northampton County coroner, and numerous detectives and police officers. Appellant and Hughes did not testify and presented no evidence.

On January 20, 2017, the jury convicted Appellant of First-Degree Murder and Criminal Conspiracy.

3

On February 28, 2017, the trial court sentenced Appellant to life imprisonment without parole.

*Commonwealth v. Robinson*, J-S51008-18, (Pa. Super. Apr. 2, 2019) (footnotes omitted).

On April 30, 2020, Appellant filed a timely *pro se* Motion for Post-Conviction Collateral Relief. On June 8, 2020, this Court appointed Attorney Robert Eyer to represent Appellant. An issue framing conference was held on July 17, 2020. Attorney Eyer asked for leave to file an Amended PCRA Petition on behalf of Appellant. In the interim, Attorney Eyer announced his retirement as Conflicts Counsel, and this Court appointed counsel, Talia R. Mazza, Esq. (hereinafter "PCRA Counsel"), to represent Appellant. On August 20, 2020, we granted Appellant's Motion to Extend Time to File an Amended PCRA Petition.

On October 20, 2020, PCRA Counsel submitted an Amended Petition for Post-Conviction Relief, raising five claims for relief, all which dealt with ineffective assistance of counsel. The first claim, which was against Attorney Liam Riley, was a claim that Attorney Riley was ineffective for failing to file a supplemental brief regarding Appellant's pre-trial Motion for Severance. This supplemental brief was requested due to an alleged *Bruton*[3] violation in that Appellant's co-defendant, Hughes, may have made an incriminating statement against Appellant. The other four claims raised in Appellant's Amended Petition for Post-Conviction Relief were against Appellant's court-appointed appellate counsel, Attorney James Brose. These claims as stated in Appellant's Amended PCRA Petition were as follows: 1) that Attorney Brose failed to advance on appeal a sufficiency of the evidence claim, 2) that Attorney Brose failed to advance on appeal this Court's denial of Appellant's Motion for Severance, 3) that Attorney Brose failed to advance on appeal a prosecutorial misconduct claim due to the Assistant District Attorney's closing argument in which the Assistant District Attorney stated that Appellant was "caught in a lie" to a detective regarding his location during the murder; and

---

[3] *Bruton v. United States*, 391 U.S. 123 (1968), held that a defendant's confrontation clause rights are violated when a non-testifying codefendant's confession naming the defendant as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider the confession only against the defendant.

4

4) that Attorney Brose failed to advance on appeal a claim relative to our ruling that a 911 call, identifying a Honda Odyssey as being present at the crime scene, was admissible evidence.

On November 23, 2020, this Court held an evidentiary hearing on the issues that Appellant raised in his Amended PCRA Petition. Following this hearing, PCRA Counsel submitted a *Turner/Finley* no-merit letter in lieu of a brief in support of the PCRA Petition, as well as a Motion to Withdraw as Counsel. By Order dated January 27, 2021, having already held an evidentiary hearing, we dismissed Appellant's PCRA, stating that upon consideration of the no-merit letter, as well as upon our independent review of the record in this matter following the hearing on the PCRA Petition, we were satisfied that there were no genuine issues concerning any material fact and that Appellant was not entitled to post-conviction collateral relief. We also permitted PCRA Counsel to withdraw.

We note that on February 25, 2021, Appellant filed *pro se* documents, entitled "Defendant's Objection to PCRA Court's Notice Pursuant to Pa.R.Crim.P. 907 of Intention to Dismiss Defendant's Motion for Post-Conviction Collateral Relief" and "Objections to PCRA Attorney's 'No-Merit' Brief Letter Dated January 25, 2021." However, we denied these "Objections" as moot and procedurally improper.[4]

On March 1, 2021, Appellant filed a Notice of Appeal of our January 27, 2021 Order dismissing his Amended PCRA Petition. On March 29, 2021, pursuant to this Court's 1925(b) Order, Appellant filed a *pro se* Concise Statement of Matters Complained of on Appeal.

## II. Matters Complained of on Appeal

In his Concise Statement of Matters Complained of on Appeal, Appellant asserts the following ten issues:

---

[4] We did not issue a notice of intent to dismiss the Amended PCRA Petition without a hearing because a hearing on Appellant's Amended PCRA Petition was held on November 23, 2020. In our Order of January 27, 2021 dismissing Appellant's Amended PCRA Petition, which constituted a final order for purposes of appeal, we advised Appellant of his right to appeal to this Court within thirty days of the date of the Order. *See* Pa.R.Crim.P. 910; Pa.R.A.P. 903(a).

1. The evidence was insufficient to support a conviction of criminal homicide, where the Commonwealth failed to present sufficient evidence to identify the Appellant as the perpetrator of this homicide beyond a reasonable doubt.

2. The evidence was insufficient to support a conviction of criminal conspiracy to commit homicide, where the Commonwealth failed to establish beyond a reasonable doubt, the existence of a conspiratorial agreement.

3. The redaction of the non-testifying co-defendant's statement and confession, along with statements by the prosecutor in closing arguments was insufficient to preclude the jury's inference that the Appellant was the co-conspirator in violation of Bruton v. United States, 391 U.S. 123, 88 S.Ct 1620 LEd. 2d 476 (1968) [sic] and its progeny.

4. Trial counsel was ineffective for failure to argue and file a supplement [sic] brief in support of the Severance Motion.

5. The Appellant's sixth amendment confrontation clause rights were violated by not allowing the Appellant to cross-examine Mr. Sandt as to his identification of what he believed to be a Honda Odyssey.

6. The Trial Court erred in failing to grant a mistrial on prosecutorial misconduct when prosecutor express [sic] his personal belief when he stated that the Appellant "Gets caught in a lie" 1/19/17 at p. 83.

7. The Trial Court erred in failing to grant a mistrial on prosecutorial misconduct when the prosecutor repeatedly made mis-statements of the fact of the record when he stated that the Appeallant [sic] said that "I really was not their [sic] "and he "fesses up" [sic] 1/19/17 at p. 83 and 1/19/17 at p. 85, "we haven't pushed the issue of Mr. Holton dealing drugs." 1/19/17 at 67, 77.

6

8. The Trial Court erred in failing to grant a mistrial on prosecutorial misconduct when prosecutor reference to unrelated infamous crimes, OJ Simpson and the Boston bomber case. 1/19/17 at p. 71 and 1/19/17 at 73.

9. PCRA Court and PCRA Counsel failed to comply with the requirements of Turner/Finley prior to Counsel's "No-merit brief letter["] and Motion to Withdraw and PCRA Court's Order to dismiss when PCRA Counsel failed to add claims 5, 8 in original PCRA Petition 4/30/2020 at p. 55-57, and 58-60.

10. Counsel failed to object during trial and preserve for appeal an introduction of hearsay testimony that was used to describe his client as a shooter.

We address below Appellant's statements of matters complained of on appeal.

## III. Discussion

"[A]n appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error. The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." *Commonwealth v. Freeland*, 106 A.3d 768, 775 (Pa. Super. 2014) (quoting *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014)) (citations and internal quotation marks omitted).

To be entitled to PCRA relief, an appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, and "the failure to litigate the issue prior to or during trial ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.*; 42 Pa.C.S. § 9543(a)(2), (a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which [appellant] could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). An issue is waived

7

if appellant "could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b), *see also, Commonwealth v. Robinson*, 82 A.3d 998, 1005 (Pa. 2013).

1. "The evidence was insufficient to support a conviction of criminal homicide, where the Commonwealth failed to present sufficient evidence to identify the Appellant as the perpetrator of this homicide beyond a reasonable doubt."

2. "The evidence was insufficient to support a conviction of criminal conspiracy to commit homicide, where the Commonwealth failed to establish beyond a reasonable doubt, the existence of a conspiratorial agreement."

On his direct appeal, Appellant raised, albeit untimely, the issue of sufficiency of the evidence with respect to the offenses of which he was convicted - criminal homicide and criminal conspiracy to commit homicide. In our Memorandum Opinion that was filed in accordance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, we addressed all of the issues contained in Appellant's untimely Rule 1925(b) Statement, including the issues regarding sufficiency of the evidence. In the Pennsylvania Superior Court's Opinion affirming the Judgment of Sentence, the Superior Court noted the late filing of Appellant's Rule 1925(b) Statement. In this Opinion, the Superior Court addressed the merits of only Appellant's briefed issues, which did not include the untimely raised sufficiency of the evidence claims.[5]

Because these claims involve the sufficiency of the evidence, they necessarily implicate the "truth-determining process" and raise a question whether an "innocent individual" has been convicted. *Commonwealth v. Perlman*, 572 A.2d 2, 4-5 (Pa. Super. 1990). Therefore, sufficiency of the evidence claims are cognizable under the PCRA, and a waiver of the claim on direct appeal may

---

[5] The two briefed issues that the Superior Court addressed were whether this Court erred by permitting evidence that Appellant was present at a drug transaction earlier in the day of the subject homicide and whether we erred by not declaring a mistrial after the prosecutor's opening remarks identified Appellant as a drug dealer.

be excusable. *See id*, 572 A.2d at 4.[6] Although we believe that Appellant's claims involving sufficiency of the evidence may be waived at this point, we address the merits of same below.

As indicated *supra*, we provided a detailed analysis regarding why Appellant's sufficiency of the evidence claims are without merit in our Memorandum Opinion that was filed in accordance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure on October 16, 2017. Our argument with respect to this issue, as set forth in our 1925(a) Memorandum Opinion, in pertinent part, was as follows:

> The standard to apply in determining the sufficiency of the evidence is whether, "viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined that all of elements of the crime to have been established beyond a reasonable doubt." *Com. v. Keblitis*, 500 Pa. 321, 456 A.2d 149 (1983). Further, our Superior Court has stated:

>> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa. Super. 2005). Nevertheless, "the Commonwealth need not establish guilt to a mathematical certainty." *Id.; see also Commonwealth v. Aguado*, 760 A.2d 1181, 1185 (Pa. Super. 2000) ("[T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence"). Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *See Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001).

>> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. *See Brewer*, 876 A.2d at 1032. Accordingly, "[t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence." *Id.* (quoting *Commonwealth v. Murphy*, 795 A.2d 1025, 1038–39 (Pa. Super. 2002)). Significantly, (the appellate court) may not substitute ... judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth,

---

[6] Notably, these claims, as presented in Appellant's instant Concise Statement of Matters, are solely claims challenging the sufficiency of the evidence and not claims of ineffective assistance of counsel by, for example, failing to timely raise such claims on appeal.

> demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld. *See* *Brewer,* 876 A.2d at 1032.

*Com. v. Rahman,* 75 A.3d 497, 500-01 (Pa. Super. 2013) (citing *Com. v. Pettyjohn,* 64 A.3d 1072 (Pa. Super. 2013) (citations omitted)).

In the instant case, the Commonwealth presented sufficient evidence in order to sustain convictions against Appellant for both Criminal Homicide for intentionally, knowingly, recklessly or negligently causing the shooting death of Holton on November 23, 2012; and Criminal Conspiracy to Commit Criminal Homicide for conspiring with Hughes to cause the death of Holton. As further discussed below, all evidence presented at trial, including the testimony of multiple witnesses presented at trial, establish that Appellant caused the shooting death of Holton on November 23, 2012.

A person commits the crime of criminal homicide and violates 18 Pa. C.S. § 2501 (a) "if he intentionally, knowingly, recklessly or negligently causes the death of another human being." To sustain a criminal conspiracy conviction, the Commonwealth must establish that a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903;[7] *Com. v. Rios,* 546 Pa. 271, 684 A.2d 1025, 1030 (1996). The overt act need not accomplish the crime - it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. *Com. v. Weimer,* 602 Pa. 33, 38–39, 977 A.2d 1103, 1105–06 (2009).

The evidence presented at trial, including the extensive testimony of multiple witnesses, was sufficient to enable the jury to find that all of the elements of the charged offenses were established beyond a reasonable doubt. Detectives from the Easton Police Department reported to a residence on the south side of Easton in response to a 911 call that was made at approximately 5:45 p.m. on November 23, 2012. Notes of Testimony (N.T.), 1/12/17, at p. 73; N.T., 1/17/17 at pp. 42, 45. The 911 call revealed that a witness, Christine Sandt, heard gunshots fired when she was driving in the City of Easton across the street from the Sole Mio Restaurant and observed two individuals in dark clothing running toward a minivan. N.T., 1/12/17, at pp. 73-75; N.T., 1/17/17, at pp. 42-43, 46-47; *See also* Com. Exhibit 12.

At the scene, the detectives identified Holton as the victim. N.T., 1/10/17, at p. 102. The coroner determined that the cause of death was a homicide by multiple gunshot

---

[7] Section 903 provides, in relevant part:

> (a) Definition of conspiracy.-A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime ...

wounds. *Id.* at p. 156. An expert in forensic pathology, Dr. Zhongxue Hua, M.D., testified that an autopsy of Holton's body revealed that there were six wounds caused by five shots fired at Holton. N.T., 1/12/17, at pp. 128-129. Dr. Hua testified that a bullet that entered Holton from "the left side armpit area cross midline into the left lung into the midline major blood vessel into the right upper and lower portion, subsequently exit in the right side of the back" was the fatal gunshot wound. *Id.* at p. 124.

Further, Detectives Darren Snyder, Christopher Miller and Matthew Rush, who are employed with the City of Easton Police Department, testified regarding video surveillance on the evening of the shooting. The video depicted two individuals exit a dark-colored minivan about a block away from the crime scene, walk in the direction of the scene, then run back toward the minivan in the area of the Sole Mio Restaurant and drive away minutes later. N.T., 1/12/17, at pp. 181, 212; N.T., 1/13/17, at pp. 10, 12; N.T., 1/17/17 at pp. 143-145. The Commonwealth also presented evidence that Appellant and Hughes were the individuals seen in the video surveillance. Appellant's girlfriend, Ms. Doorley, was the owner of a dark-colored minivan. N.T., 1/12/17, at pp. 189-192. When Detectives Miller and Rush went to Appellant's home to search the minivan at the home of Appellant and Ms. Doorley, Appellant indicated that he was the operator of the minivan on the date of the homicide, and he became emotional when he was questioned further about the incident. *Id.* at pp. 194-195, 196-197, 219-220. A search of the minivan revealed gunshot residue on the steering wheel and the driver's side interior door handle. N.T., 1/11/17 at p. 125.

Testimony from an individual named Corey Reavis (hereinafter, "Reavis") established that Appellant and Hughes were together during the afternoon on the date of the homicide. Reavis testified that, subsequent to "hanging out" with Appellant and Hughes at his house on that day, just before the shooting occurred, he drove Holton to a location near the residence where Holton was shot. N.T., 1/13/17, at p. 190, 192-193, 196.

Cell phone records confirmed that Appellant and Hughes had been making several phone calls between themselves and Reavis shortly before the time of the homicide, but at approximately 5:39 p.m. – just before the time that the 911 call was made– all calls between them ceased, only to resume again minutes following reports of the shooting. N.T., 1/12/17, at pp. 15-16, 19-20, 22-25. The cell phone records also evidenced that Appellant and Co-Defendant Hughes were in close proximity to one another when the calls were made because the calls were being transmitted from the cell tower located on the south side of Easton. *Id.* at pp. 15-16.

Other testimony confirmed that Appellant and Hughes were together during the afternoon on the date of the homicide. Specifically, the vice unit of the Easton Police Department was investigating Hughes on that day. As a result of this vice investigation, photographs were taken showing that Hughes made a hand-to-hand drug transaction and then went to a house located several minutes from the murder scene. Detective Arrendondo testified that he observed a Honda Odyssey, parked outside of this house. N.T., 1/12/17, at pp. 140-145.

11

The police investigation further disclosed that Hughes had provided several different and inconsistent alibis as to where he was on the day of the homicide, none of which the detectives could substantiate. N.T., 1/18/17, at p. 7. Detective Darren Snyder conducted an interview of Hughes. Detective Snyder testified as follows:

> When I first asked him where were you on this date, it's a significant date we're talking about, Black Friday, the day after Thanksgiving. This is less than two weeks afterwards. When I first spoke to him, his first indication was he was at his girlfriend's the entire day. Then the photographs and make the purchase or the sale by the vice detectives, then he changed his story. [sic] I was at my girlfriend's house from 3 p.m. until 8:30 p.m. when I went to my other girlfriend's house. During the course of speaking with him, again it continued to evolve to, I was selling drugs to a guy name [sic] Mike; in this case he did. However, that was earlier in the morning not at the time his homicide occurred. Then he changed his story again that he sold to a white guy named Dan and he provided me a description, at Center and Berwick Street, which is near where it happened but still a significant distance away. Speaking to him further, he admits to driving by the victim's house shortly before the homicide occurs. He also says that he sees Sabree,[8] the person who drove up to – the victim up to the scene. He also indicates that he would have been driving. By his own words, he admits that he was probably driving by the scene around the time the homicide occurs. This evolution of where it's at to me it struck me as it kept changing. Any time I threw something else at him, it would change to adapt to whatever I was saying. That was, to me, a significant event in there.

*Id.* at pp. 7-9.

Timothy Graves (hereinafter, "Graves"), an inmate incarcerated in a state correctional facility who shared a prison transport with Hughes, testified that Hughes boasted to him about the fact that he had prepared an alibi for the time of the homicide. N.T., 1/17/17, at pp. 88, 92. Hughes indicated to Graves that the reason for the instant homicide was because Hughes felt disrespected by the actions of a girl he was seeing while he was incarcerated. *Id.* at pp. 90-92. Graves testified that Hughes stated to him that "his mans handled that." When Hughes made this statement to Graves, Graves testified that Hughes used a hand gesture to give the impression that Hughes' "mans" shot the new boyfriend of Hughes' ex-girlfriend. *Id.* at p. 92.

Multiple letters that Hughes wrote to the girl referred to in Graves' testimony, Nicole Greene, were submitted at trial. In these letters, Hughes professed his love to Ms. Greene. *See* Com. Exhibit 47 B; *see also* N.T. 1/18/17 at pp. 27-61.

Hughes' cellmate, James Martin, testified at trial regarding what Hughes told him about this case. The testimony was as follows:

---

[8] Sabree is Corey Reavis' nickname. N.T., 1/13/17, at p. 198.

| | |
|---|---|
| **Attorney Pepper:** | Did he tell you anything about it after reading that newspaper article about the murder in this case? |
| **Martin:** | Not at first. It was like a couple days later, and I don't know how the conversation started but it came up, the homicide, you know, with the boy. It was a big thing about Larry Holmes about putting up for the boy and stuff like that and I let it go. He said, yeah, that's my work. |
| **Attorney Pepper:** | ... He said in referring to the article about the killing, the murder, he said, that's my work? |
| **Martin:** | Yeah. He was like, that's my work. My mans did it. |
| **Attorney Pepper:** | He said, that's my work; my man did it? |
| **Martin:** | Yeah. |

N.T., 1/13/17, at pp. 90-91.

Finally, Detective Snyder testified that his investigation revealed that there were at least two shooters. Scientific analysis of the shell casings that were found on the porch of the scene and the live round that was next to it came from one weapon. N.T., 1/11/17, at pp. 5, 39. The analysis further revealed that the bulk of the shell casings at the scene, which were found near the body of Holton, came from a separate firearm. *Id.* Detective Snyder explained as follows:

> All the shell casings under the tent came back to the same weapon. The live round that was found on the scene was compared to the shell casings that was [sic] found on the porch next to it. They came back to a second weapon. The way they determine this is every time a firing pin hits the back, it makes a certain impression. They examine this under a microscope. They can compare striations to each other and do that match. That's how they're able to determine that. All the shell casings that were under that tent area, one firearm. Live round and shell casing on the porch was from a second firearm even though same caliber and make and model of ammunition, they were determined to be two separate weapons.

*Id.* at p. 39. Detective Snyder opined that there were not only two separate firearms used, but that there were also two separate shooters. He reached this conclusion based on the significant distance between the location of where the bulk of the shell casings were found and the location of where the other casings and live round were found. *Id.* at p. 40.

13

The evidence presented at trial shows that Hughes was the member of the conspiracy who devised the murderous plot and ordered Appellant, his co-conspirator, to carry out the plot. In accordance with these orders, Appellant went to the home of Janine Edwards, where the murder occurred, which was where they expected the victim to be at that time, and murdered the victim by shooting him at least five times. *See* N.T., 1/12/17, at pp. 128-129. This evidence was sufficient to establish beyond a reasonable doubt that Appellant, in a conspiratorial fashion, acted with malice aforethought and with a specific intent to kill. *See Com. v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977) (evidence that defendant was member of conspiracy to kill three persons was sufficient to support guilty verdict against defendant in prosecution of three counts of first degree murder).

Trial Court Opinion, 10/16/17, at pp. 4-10.

For the reasons stated on pages 4-10 of our Memorandum Opinion, set forth above, Appellant is not entitled to relief based on his sufficiency of the evidence claims.[9]

3. **"The redaction of the non-testifying co-defendant's statement and confession, along with statements by the prosecutor in closing arguments was insufficient to preclude the jury's inference that the Appellant was the co-conspirator in violation of Bruton v. United States, 391 U.S. 123, 88 S.Ct 1620 LEd. 2d 476 (1968) [sic] and its progeny."**

Upon review of this alleged statement of error, we submit that it is unclear as to what Appellant is objecting. Appellant does not specify any statement of his co-defendant, nor does he specify what comments of the prosecutor to which he is referring.

Appellant's co-defendant, Hughes, did not take the witness stand at the time of trial. However, if Appellant is referring to the testimony of Hughes' cellmate, James Martin, in which Mr. Martin stated that Hughes told him that it was "work" and that his "mans did it", Appellant's issue has no merit.

Prior to Mr. Martin's testimony, counsel for the Commonwealth stated the following for the record, but out of the presence of the jury:

> For the record, Mr. Martin is here. I met with him for approximately ten minutes. And I advised Mr. Martin that due to certain legal requirements in his testimony, he cannot say ... that defendant Hughes told Mr. Martin my boy, quote, "O", end quote,

---

[9] We note that appellate counsel for Appellant's co-defendant, Mr. Hughes, had argued a sufficiency of the evidence claim to the Superior Court. In an Opinion dated April 3, 2019, the Superior Court struck down this claim. *Commonwealth v. Hughes*, J-S51009-18 (Pa. Super. Apr. 3, 2019).

did it. I instructed Mr. Martin that he is permitted to say, quote, Mr. Hughes as saying my boy did it, but he cannot use the word "O."

N.T., 1/13/2017, pp. 85-86.

This Court instructed Mr. Martin as follows: "... I need to issue an order, an instruction to you to follow what Mr. Pepper said. I need you to not mention that Mr. Hughes made any reference to anyone named "O." It is permissible for you to mention, if it's truthful, that Mr. Hughes mentioned the phrase my boy. ..." *Id.* at p. 86. Following these comments on the record, Appellant's trial counsel stated that he was satisfied with the colloquy. *Id.* at p. 88.

The testimony of James Martin, relevant to this issue, was the following:

| | |
|---|---|
| **Attorney Pepper:** | Did he tell you anything about it after reading that newspaper article about the murder in this case? |
| **Martin:** | Not at first. It was like a couple days later, and I don't know how the conversation started but it came up, the homicide, you know, with the boy. It was a big thing about Larry Holmes about putting up for the boy and stuff like that and I let it go. He said, yeah, that's my work. |
| **Attorney Pepper:** | ... He said in referring to the article about the killing, the murder, he said, that's my work? |
| **Martin:** | Yeah. He was like, that's my work. My mans did it. |
| **Attorney Pepper:** | He said, that's my work; my man did it? |
| **Martin:** | Yeah. |

N.T., 1/13/17, at pp. 90-91. During his testimony, Mr. Martin never made any direct reference to Appellant or to anyone named "O", and no objection was made by trial counsel. Because this issue was not objected to during trial and because this issue was not raised in Appellant's PCRA Petition, we believe this issue to be waived. However, should it not be considered as waived, it is nevertheless meritless.

15

In *Bruton*, the United States Supreme Court held that, if a non-testifying co-defendant's confession directly and powerfully implicates the defendant in the crime, then an instruction to the jury to consider the evidence only against the co-defendant is insufficient, essentially as a matter of law, to protect the defendant's confrontation rights. *See Com. v. Brown*, 592 Pa. 376, 394, 925 A.2d 147, 157 (2007) (summarizing holding of *Bruton*). Therefore, *Bruton* applies when there is a powerfully incriminating confession made by a non-testifying defendant during a joint trial. Here, we do not believe that there was any testimony that would directly and powerfully implicate Appellant. The Pennsylvania Supreme Court has held that substituting the neutral phrase "the guy" or "the other guy" for the defendant's name is an appropriate redaction. *See Commonwealth v. Travers*, 564 Pa. 362, 372, 768 A.2d 845, 851 (2001). The redaction employed in this case, "the boy" and "my mans", did not implicate *Bruton* concerns in the same way as a statement that incriminates the defendant on its face, either by actually naming him or by an obvious method of deletion. *Id.*

With regard to any statement made by the prosecutor during closing arguments that would have been in violation of *Bruton*, again, it is unclear as to what Appellant is referring. Nevertheless, we submit that nothing in the prosecutor's closing remarks disclosed to the jury that Mr. Hughes's statement as relayed in Mr. Martin's testimony had been redacted and/or unequivocally identifies Appellant as the individual whose name was removed. *See Commonwealth v. Cannon*, 610 Pa. 494, 22 A.3d 210, 219 (2011). Even if the prosecutor did reference evidence other than the redacted statement, linking Appellant to the crime with other properly admitted evidence is not a violation of the *Bruton* rule. *See id.*

4. **"Trial counsel was ineffective for failure to argue and file a supplement [sic] brief in support of the Severance Motion."**

To establish trial counsel's ineffectiveness, a petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for the course of action or inaction

16

chosen; and (3) counsel's action or inaction prejudiced the petitioner. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

A PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S. § 9543(a)(2)(ii). Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. *Freeland*, 106 A.3d at 775. Counsel's assistance is deemed constitutionally effective once it is determined that the petitioner has not established any one of the prongs of the ineffectiveness test. *Commonwealth v. Rolan*, 964 A.2d 398, 406 (Pa. Super. 2008).

Here, Appellant's Motion for Severance was filed by Attorney Matthew Deschler, who represented Appellant pre-trial. We denied the Motion for Severance and permitted Appellant's case to be joined with the case of his co-defendant, Patrick Hughes. Attorney Deschler subsequently withdrew as counsel for Appellant, and Appellant privately retained Attorney Liam Riley as his counsel. On March 7, 2018, Attorney Riley appeared for a hearing, and the following discussion took place on the record between Attorney Riley, Assistant District Attorney Blake, and the Court with respect to Appellant's Motion for Severance:

| THE COURT: | All right. Mr. Riley, I know you didn't file a motion for [Appellant], prior counsel did, but let me just go through with you what I believe is in his motion. There was a motion for severance. I heard that. I did hear that at the time I decided to join the cases. Did you need to be heard on that again today? |
|---|---|
| ATTORNEY RILEY: | I did read his motion and his brief. And Your Honor, the only thing I was unclear of is whether or not the issue of the co-defendant's statements was addressed during that argument. I believe the |

17

|  | Commonwealth intends to introduce a statement through an informant that Mr. Hughes made some admissions. |
|---|---|
| THE COURT: | I don't think we did. Did we? |
| ATTORNEY BLAKE: | There was some discussion about that. But we didn't have a hearing. |
| THE COURT: | If you need to be heard on that today, you may. You want me to rule on your motion for severance as a result of that? |
| ATTORNEY RILEY: | Yes, Your Honor, unless Your Honor would like additional case law on that subject. |
| THE COURT: | If you want to submit it, you can. |

Notes of Testimony (N.T.) 3/7/2018, at pp. 16-17. Subsequently, during this same hearing, the following exchange took place on the record:

| ATTORNEY RILEY: | Is it still the intention of the Commonwealth to introduce statements of Mr. Hughes that implicate [Appellant]; is that correct? |
|---|---|
| ... | |
| ATTORNEY BLAKE: | ... There may be a statement, and I understand under Bruton that statement would have to be kept out or else it would have to be redacted in some way to get it in. I'm aware of that. |
| ATTORNEY RILEY: | That is my only issue with the consolidation whether or not the details of how that would be admitted are going to be. So I guess maybe before we go forward I can clarify with counsel – it doesn't have to be today exactly – what he wants to introduce and I may have a supplemental motion. |

Id. at p. 170. At the conclusion of the hearing, when this Court attempted to clarify that Attorney Riley was briefing the argument regarding Appellant's Motion to Suppress and/or the Severance Motion, Attorney Riley responded, "Yes, Your Honor. The severance only pending my conversations with counsel." Id. at p. 172.

18

Attorney Riley never did file a supplemental brief. In our Opinion disposing of Appellant's omnibus pretrial motions, we stated "[t]his Court never received further argument from Robinson, and as such, we infer that Robinson does not take issue with the cases being consolidated due to any statements that may be offered by the Commonwealth." Trial Court Opinion, 8/15/16, at p. 21.

At the PCRA hearing in this matter, Attorney Riley testified as follows with respect to this issue:

| | |
|---|---|
| **PCRA COUNSEL:** | So at the stage where you were [Appellant's] attorney, was there any argument that Judge Sletvold had asked of counsel regarding severance? |
| **ATTORNEY RILEY:** | I don't believe there was argument ... [T]he issue that I saw to be the most significant was the Bruton issue with Mr. Hughes' statement. So I raised that issue, not in a formal motion, but with Mr. Blake ... |
| | Based on our conversation, we agreed that the statement of Mr. Hughes would be redacted such as the Bruton issue would be corrected, and I did not see any other issue to raise with respect to that issue, with respect to severance issues. |
| | So I believe I stated at one court appearance ... that I would have no further argument on that issue unless we could not come up with an agreed upon redaction. |

N.T. 11/23/2020, at pp. 4-5. On cross-examination of Attorney Riley, the following took place:

| | |
|---|---|
| **ADA PEPPER:** | Mr. Riley, if I understand your testimony correctly, you were not directed by the Court to file a supplemental brief, you were offered the opportunity; is that correct? |
| **ATTORNEY RILEY:** | Yes, I think that's right. |
| **ADA PEPPER:** | And you felt it was not necessary to file a supplemental brief at that time since those issues have previously been briefed and argued by prior counsel? |

19

ATTORNEY RILEY: Yes, that's correct. I believe there were a few motions that were outstanding at that point, including suppression. And I did argue that issue, but not with respect to severance. I did not. You are correct.

*Id.* at pp. 8-9.

In the no-merit letter, with respect to the issue of whether Attorney Riley rendered ineffective assistance in failing to provide further argument regarding Appellant's Motion for Severance, PCRA Counsel provided the following informed analysis of the circumstances of this case as they apply to the relevant law:

A review of the record as well as testimony elicited from Attorney Riley demonstrate that he, after discussion with the Commonwealth, decided that no supplemental brief was warranted. He was able to come to an agreement with the prosecution that the statement from [Appellant's] co-defendant was sufficiently redacted so as to not implicate *Bruton*. Attorney Riley had a reasonable basis not to file this brief as the issue that said brief was to encompass was already addressed. Therefore, under Strickland, Attorney Riley's representation of the Defendant was not ineffective and as such [Appellant] is not entitled to relief. Id.

No-Merit Letter, 1/25/21, p. 4 (emphasis in original). [10] We agree and adopt this assessment herein as the reason for which this issue on appeal lacks merit. As made clear by the testimony, Attorney Riley made the informed decision not to file a supplemental brief with respect to the severance motion. Further, to the extent that the contested *Bruton* issue concerned the redacted statement of Mr. Hughes as testified to by James Martin, which is discussed above,[11] this underlying issue has no

---

[10] We note that while this analysis is found on the fourth page of PCRA Counsel's no-merit letter, the pages of the no-merit letter are unnumbered.

[11] At a hearing held on October 9, 2015, counsel for the Commonwealth stated the following:

To my knowledge, **there is but one possible statement from anybody [that] implicates the two defendants together.** In other words, Mr. Robinson does not give a statement that implicates Mr. Hughes. Mr. Hughes does not give a statement that implicates Mr. Robinson. There is a witness, and he's mentioned in the affidavit of probable cause, that says words to the effect, Mr. Hughes admitted that this was his work and he had his boy "O" do it. He says "O". He never said Omar Robinson. Normally, under *Bruton*, **I recall that being redacted or changed to my boy X did it, which would be the standard redaction for that type of statement. That's the only one I'm aware of.** I don't think that one statement, which we would be willing to alter in some redacted form, is enough to prevent these two from being joined.

N.T., 10/9/2015, pp. 24-25 (emphasis added).

20

merit. Attorney Riley's decision to forego argument on a meritless issues cannot properly serve as the basis of a claim of ineffective assistance of counsel. Therefore, Appellant is entitled to no relief on this alleged statement of error.[12]

5. "The Appellant's sixth amendment confrontation clause rights were violated by not allowing the Appellant to cross-examine Mr. Sandt as to his identification of what he believed to be a Honda Odyssey."

Similar to Appellant's alleged errors above regarding sufficiency of the evidence, Appellant untimely raised this alleged error regarding a violation of his sixth amendment rights on direct appeal. The merits of Appellant's untimely-raised sixth amendment claim were not addressed on appeal; however, we nevertheless addressed the merits of same in our Memorandum Opinion in accordance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, filed on October 16, 2017. We note that in Appellant's Amended PCRA Petition, Appellant raised a claim of ineffective assistance of counsel against his appellate counsel, Attorney Brose, for failing to advance on appeal the ruling of admissible hearsay regarding the 911 call. However, Appellant's issue as presented in the instant appeal is not an ineffective assistance of counsel claim, but appears to solely allege an error on behalf of the Court. Therefore we believe this issue to be waived.

Even if this issue is not deemed to be waived, it is without merit for the reasons stated on pages 19-22 of our Rule 1925(a) Opinion referenced above. Our argument with respect to this issue, as set forth in our 1925(a) Memorandum Opinion, is the following:

> In this Statement of Error, Appellant objects to the playing of one 911 tape to the jury in which Christine Sandt reported her observations with regard to the November 23, 2014 shooting. This 911 tape reflects a brief conversation between Ms. Sandt and the 911 operator in which Ms. Sandt reports that there were shots fired, that she observed men running off toward a dark colored van that was located

---

[12] We note that appellate counsel for Appellant's co-defendant, Mr. Hughes, had argued to the Superior Court that we erred in denying his motion to sever his case from Appellant's case. In an Opinion dated April 3, 2019, the Superior Court found this claim to be meritless. Commonwealth v. Hughes, J-S51009-18 (Pa. Super. Apr. 3, 2019).

by the Solo Mio Restaurant[13], and that the police could catch them if they could get there quickly. N.T., 1/12/17, at pp. 73-75; *see also* Com. Exhibit 12. Additionally, Ms. Sandt's husband (hereinafter, "Mr. Sandt") is heard in the background of the 911 tape indicating to Ms. Sandt that the minivan toward which the suspects were running was a Honda Odyssey. *See* Com. Exhibit 12. Ms. Sandt then relayed this information to the 911 operator. *Id.* Appellant argues that the introduction of this 911 tape violated Appellant's right to confront Mr. Sandt because he was unavailable to testify as to his knowledge regarding the make and model of the minivan and because Ms. Sandt was not able to personally identify the minivan as a Honda Odyssey at the time she placed the 911 call.

Initially, we point out that, via the discovery process, defense counsel had proper notice of this 911 tape and its contents well before the start of trial. Further, Mr. Sandt was not named on the Commonwealth's list of witnesses it intended to call at trial, which list was provided to defense counsel prior to trial. N.T., 1/12/17, at pp. 92-93, 97-98, 103. Rather than presenting this Court with an appropriate Motion in Limine on this issue of Mr. Sandt's availability as a trial witness, counsel for Appellant waited until right before Ms. Sandt was about to testify during the trial to present this issue to the Court.

Nevertheless, it was not error for the jury to hear the contents of the 911 tape because the statements therein were nontestimonial. With respect to the Confrontation Clause, the Sixth Amendment of the United States Constitution provides: "[i]n all criminal proceedings the accused shall enjoy the right ... to be confronted with the witnesses against him." The United States Supreme Court found that this Clause is applicable where the statement elicited is "testimonial." In *Crawford v Washington*, the Supreme Court held that testimonial statements by declarants who do not appear at trial may not be admitted unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004). Here, however, the Confrontation Clause is not implicated because the statements at issue in the 911 tape are nontestimonial.

In *Davis v. Washington*, where the statements at issue were from a victim describing an ongoing domestic disturbance to a 911 operator, the Supreme Court defined what constitutes "testimonial" and "nontestimonial" statements as follows:

> [S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

---

[13] We heard testimony from Detective Darren Snyder, that the Sole Mio Restaurant is less than half a block from the crime scene. N.T., 1/11/17, at p. 5.

*Davis v. Washington*, 547 U.S. 813, 813–14, 126 S. Ct. 2266, 2268–69, 165 L. Ed. 2d 224 (2006). The Court further stated, "A 911 call ... and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827 (internal citations and punctuation omitted).

Further, in *Michigan v. Bryant*, the Supreme Court found that a statement made to law enforcement for the primary purpose of responding to an ongoing emergency is nontestimonial and not within the scope of the Confrontation Clause. *Michigan v. Bryant*, 562 U.S. 344, 370, 131 S. Ct. 1143, 1162, 179 L. Ed. 2d 93 (2011). The *Bryant* Court stated, "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 370–71.

Instantly, because the 911 call at issue was made for the primary purpose of responding to an ongoing emergency, it consists of nontestimonial evidence which falls outside of the Confrontation Clause and need only satisfy the Evidence Rules for admissibility. *See Com. v. Williams*, 103 A.3d 354 (Pa. Super. 2014). In *Commonwealth v. Hood*, 872 A.2d 175 (Pa. Super. 2005), the Pennsylvania Superior Court found that a statement in a 911 call can be either an excited utterance or present sense impression if the surrounding circumstances indicate that the caller actually witnessed what they described in the call. *Id.* at 184.

In the instant matter, Ms. Sandt's statements consisted of excited utterances as she described, in a hurried manner, that she had just heard shots fired in the City of Easton. This call was made to the 911 dispatcher as Mr. and Ms. Sandt were observing the event transpire at around 5:45 p.m. on the evening in question. Ms. Sandt indicated in the call that she observed two men run off toward a minivan and asked for the dispatcher to quickly send police so that the suspects could be apprehended. Therefore, it is clear that all of the descriptive statements made in this call, including the description of the minivan as a Honda Odyssey, were made during an ongoing emergency and to prevent any further danger to the public.

Evidence adduced at Appellant's trial contained sufficient "other corroborating evidence" to justify the admission of the 911 tape at issue. *Hood* at 184.[14] This other evidence that corroborates Ms. Sandt's statement that the minivan she observed was a dark colored Honda Odyssey includes the video recovered from the Sole Mio Restaurant that depicts two males running toward a dark colored minivan, as well as other witnesses who testified that they observed suspects running from the scene toward the Sole Mio Restaurant.

As such, the testimony of neither Ms. Sandt nor Mr. Sandt was required with respect to this call as the statements made in the 911 call are nontestimonial statements not subject to the Confrontation Clause and do not constitute inadmissible hearsay.

---

[14] Pursuant to the Rules of Evidence, statements made in 911 calls are admissible hearsay as either excited utterances or present sense impressions, as long as there is corroborating evidence presented to indicate that the person who called actually witnessed what they describe in the call. *Id.*

23

Further, they were corroborated by other evidence adduced at trial. Therefore, this Court did not commit an error when it allowed the introduction of the statements made in the 911 call.

Trial Court Opinion, 10/16/17, at pp. 19-22 (internal footnote omitted).[15]

6. **"The Trial Court erred in failing to grant a mistrial on prosecutorial misconduct when prosecutor express [sic] his personal belief when he stated that the Appellant 'Gets caught in a lie' 1/19/17 at p. 83."**

This issue was raised at the time of trial, and it was raised in the context of an ineffective assistance of counsel claim in Appellant's counseled Amended Petition for Post-Conviction Relief.[16] Appellant argues that Assistant District Attorney Pepper committed prosecutorial misconduct during his closing when he misstated evidence that Appellant "gets caught in a lie" when he tells officers where he was at the time of the incident. See N.T., 1/19/2017, p. 83. This issue lacks any arguable merit because the objected-to comment was supported by the evidence in this case and because the remarks were not unfairly prejudicial.

It is well-established that a prosecutor may vigorously argue his case to the jury as long as his comments are supported by the evidence or constitute reasonable inferences therefrom. *Commonwealth v. Washington*, 549 Pa. 12, 27, 700 A.2d 400, 407 (1997). So long as the prosecutor's comments did not form in the jury's minds a fixed bias and hostility towards a defendant such that the jury could not weigh the evidence and render a true verdict, the prosecutor's

---

[15] We note that appellate counsel for Appellant's co-defendant, Mr. Hughes, had argued to the Superior Court that the admission of Mr. Sandt's hearsay statements violated his confrontation right because Mr. Sandt did not testify at trial. In an Opinion dated April 3, 2019, the Superior Court found no merit to this claim. *Commonwealth v. Hughes*, J-S51009-18 (Pa. Super. Apr. 3, 2019).

[16] The claim in Appellant's Amended PCRA Petition was set forth as follows:

Defendant's fourth claim for relief is against Attorney Brose for failing to advance a prosecutorial misconduct claim on appeal. In ADA Pepper's closing, he instructs the jury that Defendant was "caught in a lie" to a detective regarding his location during the alleged murder ... Defense counsel, Attorney Riley, objects, arguing to the Court Attorney Pepper blatantly misstated evidence. This objection was overruled ... Attorney Brose failed to advance said claim on appeal. Defendant avers this was ineffective assistance of counsel.

24

comments generally do not constitute reversible error. *Commonwealth v. Hawkins*, 549 Pa. 352, 373, 701 A.2d 492, 503 (1997).

Nothing indicates that the jury was unable to render a true verdict in the instant case. *See Commonwealth v. Koehler*, 558 Pa 334, 737 A.2d 225 (1999) (holding no relief warranted where allegedly improper remark did not have the effect of rendering the jury unable to weigh the evidence objectively). Assistant District Attorney Pepper did state that Appellant got "caught in a lie", but this comment was made in a broader context in which he referenced additional relevant evidence from the testimony at trial, telling the jury as follows:

> Incidentally, [Appellant] gets caught in a lie with the officers when he first says I was over a Northampton Crossings on 248. Completely utterly out of the area when this occurred. When the officer said, you know, there are videos over there, surveillance over there. And then he fesses up, all right. I wasn't really there.

N.T. 1/19/2017, pp. 83-84. The prosecutor's comment was not an untenable opinion, but rather a comment supported by reasonable inferences to be drawn from the evidence. *See Commonwealth v. Jones*, 546 Pa. 161, 200, 683 A.2d 1181, 1200 (1996) (holding a prosecutor's justifiable comment that the jury should find evidence of defendant's guilt overwhelming was "clearly permissible"); *Commonwealth v. D'Amato*, 514 Pa. 471, 489, 526 A.2d 300, 309 (1987) (noting a prosecutor is always allowed to argue that evidence establishes the defendant's guilt).

Further, the Court must review prosecutors' comments to ascertain their prejudicial nature to the jury. The determination whether the prosecutor's remarks were unfairly prejudicial rests within the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *Commonwealth v. Jubilee*, 589 A.2d 1112, 1114 (Pa. Super. 1991) (citations omitted). Here, not only has Appellant failed to show this claim is of arguable merit because the prosecutor's comments were not objectionable, but Appellant has failed to show the existence of prejudice because any possible prejudice engendered by the prosecutor's comments was cured by this Court's jury instructions.

We instructed the jury that they must rely upon their own recollection, not that of the prosecution, and we also instructed the jury that speeches of counsel are not part of the evidence.

These instructions were as follows:

> As members of the jury, you are the sole judges of the facts of the case. You are the sole judges of any inferences which honestly arise from those facts. And you, as jurors, are the sole judges of the credibility of the witnesses. By credibility, I mean the believability of the witnesses. You find the facts from the testimony of the witnesses and from every reasonable inference which naturally arises from that testimony, as well as from physical exhibits which may have been received into evidence. They are part of the evidence in the case and should be considered along with all of the testimony and any reasonable inference of fact which arises from the testimony.
>
> The Commonwealth has introduced evidence of statements that it claims were made by the defendants. Before you may consider the statements as evidence against the defendants, you must find that a crime was, in fact, committed; that the defendants, in fact, made the statements; and that the statements were voluntary. Otherwise, you must disregard the statements.
>
> Each juror should ultimately decide these questions for himself or herself and thereby individually accept or reject the defendants' statements as evidence. You must not allow the fact that I admitted the statement into evidence to influence you in any way during your deliberations.

N.T., 1/19/2017, pp. 106-107.

> We further instructed:
>
> Concerning argument of counsel, the speeches of counsel are not part of the evidence. And you should not consider them as such. However, in deciding the case, you should carefully consider and weigh the evidence in light of the various reasons and arguments that each lawyer presented.
>
> It is the right and duty of each lawyer to discuss the evidence in a manner that is most favorable to the side he represents. You should be guided by each lawyer's arguments to the extent that they are supported by the evidence and so far as they aid you in applying your own reason and common sense.
>
> However, you are not required to accept the arguments of the lawyers. It is for you and you alone to decide the case based on the evidence as it was presented from the witness stand and in accordance with the instructions that I am now giving you.

*Id.* at p. 121.

For the foregoing reasons, Appellant's claim for prosecutorial misconduct as a result of the prosecutor's comment that Appellant got "caught in a lie" lacks merit.

7. "The Trial Court erred in failing to grant a mistrial on prosecutorial misconduct when the prosecutor repeatedly made mis-statements of the fact of the record when he stated that the Appellant [sic] said that "I really was not their [sic] "and he "fesses up" [sic] 1/19/17 at p. 83 and 1/19/17 at p. 85, "we haven't pushed the issue of Mr. Holton dealing drugs." 1/19/17 at 67, 77."

With respect to the alleged misstatements of fact during the prosecutor's closing when the prosecutor alluded to the fact that Appellant "fesses up", this statement was directly related to the portion of the prosecutor's closing when Assistant District Attorney Pepper stated that Appellant "gets caught in a lie."[17] Therefore, for the reasons addressed above with respect to Appellant's issue number 6, this issue lacks merit.

With respect to the alleged misstatements of fact regarding "Mr. Holton dealing drugs", this issue also has no merit. Assistant District Attorney Pepper told the jury during closing arguments: "We haven't pushed the issue of Mr. Holton dealing drugs. The defense has suggested that to you, particularly Mr. Riley. It may very well have been also about rival drug dealers. I can't suggest that to you. Let the evidence take you where it will." N.T., 1/19/17, p. 67. Later during the prosecutor's closing, he stated with respect to this issue: "Again, we didn't put the drug rivalry out there. The Defense did. It's entirely possible. We don't know." Id. at p. 77.

Given these statements of the prosecutor, it is clear that the prosecutor was telling the jury that any potential "drug rivalry" was something that the jury needed to determine based on the evidence of record. This reference to a drug rivalry was also reasonably inferred from the evidence

---

[17] As stated above, the statements made during Assistant District Attorney Pepper's closing to which Appellant refers is, in relevant part, the following:

> Incidentally, Robinson *gets caught in a lie* with the officers when he first stays I was over at Northampton Crossings on 248. Completely utterly out of the area when this occurred. When the officer said, you know, there are videos over there, surveillance over there. *And then he fesses up*, all right. I wasn't really there.

N.T. 1/19/17 at pp. 83-84 (emphasis added).

27

presented at trial. By virtue of our Opinion and Order dated November 14, 2016, we permitted the introduction of evidence relating to a drug deal that occurred on the date of the homicide, including any photographs and testimony related to the drug deal. We also found, pre-trial, that the evidence of record indicated that because the transaction was drug-related, it was directly probative as it goes to the motive of the homicide. As a result, this evidence was presented to the jury throughout the trial.

Further, we read a cautionary instruction to the jury, which, although it was an instruction following opening statements and given at the outset of trial, goes directly to statements made during the prosecutor's closing concerning drug activity. The cautionary instruction given to the jury was as follows:

> In opening statements, you heard reference to the defendants being drug dealers. The Commonwealth may present evidence to suggest that the defendants were together on the day of the homicide participating in a drug transaction. This evidence may be considered as possible motive. However, the defendants are not on trial for being drug dealers. You may not convict the defendants merely because you may find that they may have been involved with drug activity. Rather, you may only convict the defendants if you find beyond a reasonable doubt that they committed a homicide of the victim and/or were engaged in a conspiracy to commit a homicide as I'll further instruct you at the end of the case.

N.T., 1/10/17, at pp. 87-88; *see also id.* at pp 76-77.

Moreover, as set forth above, we instructed the jury that speeches of counsel are not part of the evidence and they should not be considered as such. Therefore, the prosecutor's comments, referring to the victim as a "drug dealer" and mentioning a "drug rivalry", which comments were substantiated by evidence at trial and accompanied by a cautionary instruction, did not prejudice Appellant such that the jury could not fairly reach a verdict.

8. **"The Trial Court erred in failing to grant a mistrial on prosecutorial misconduct when prosecutor reference to unrelated infamous crimes, OJ Simpson and the Boston bomber case. 1/19/17 at p. 71 and 1/19/17 at 73."**

The prosecutor's remarks about the OJ Simpson case as referenced in this alleged statement are the following:

28

You heard about a glove that was picked up. OJ Simpson, if the glove doesn't fit and on and on. That's not this case. The detective said, I picked it up. It looked like it had been there for quite some time. Yeah, we sent it out. We got an unknown DNA. So what? If we can't match it to somebody, we can't match it to somebody. We told you that. We didn't hide it. It has nothing to do with this case.

N.T. 1/19/2017, p. 71. The prosecutor's remarks about the "Boston bomber" case as referenced in this alleged statement are the following:

They have thrown up in your faces the Boston bomber. Please. When you're desperate in a case you throw up nonsense like that. If you recall in the Boston bomber case, there was also video. There were phone records. There were confessions. There were all sorts of things. This is not the Boston bomber case ...

Id. at p. 73.[18]

A review of these remarks in conjunction with the other testimony of record reveals that the prosecutor simply noted prior references to these "infamous" cases that were already of record. The prosecutor related these references to other relevant evidence in the case and highlighted how the OJ Simpson and Boston Bomber cases were actually dissimilar to Appellant's case. In light of the legal precedent provided *supra*, these comments during the prosecutor's closing argument in no way would have formed in the jury a fixed bias or hostility toward Appellant such that the jury could not weigh the evidence and render a true verdict, especially considering the prior references made to these cases during trial. Further, these comments were followed by this Court's instructions to the jury, which cured any potential prejudice.

---

[18] We note that this comment was made in response to the closing argument presented by trial counsel for Patrick Hughes who stated: "... [T]he representative, Mr. Sierra, told you that in the Boston Marathon bomber case, that's what they did, a cell dump, and were able to catch the folks that were involved there." *Id.* at p. 23.

We further note that Joseph Sierra, the custodian of records for T-Mobile U.S., testified during trial about checking cell phone calls through "tower dumps." As part of this testimony he stated, "You know, most people that do tower dumps don't know what number they're looking for. The Boston bombing, that was done through tower dumps near where the bomb went off, that's how they found them and found out they were T-Mobile customers." N.T., 1/11/2017, pp. 188-189.

29

9. "PCRA Court and PCRA Counsel failed to comply with the requirements of Turner/Finley prior to Counsel's "No-merit brief letter["] and Motion to Withdraw and PCRA Court's Order to dismiss when PCRA Counsel failed to add claims 5, 8 in original PCRA Petition 4/30/2020 at p. 55-57, and 58-60."

As discussed herein, even if Appellant's PCRA Counsel had litigated statements five and eight,[19] the claims appurtenant to them would have been dismissed because they lack merit. *See discussion supra*, pp. 21-24 and 28-29. "The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit" *Commonwealth v. Kelley*, 136 A.3d 1007, 1012 (Pa. Super. 2016) (internal citation and punctuation omitted). Counsel, thus, will not be deemed to be ineffective for failing to assert a meritless claim. *Id.*

Because Appellant cannot establish that these underlying claims have arguable merit, PCRA Counsel's decision to forego these meritless issues cannot properly serve as the basis of a claim of ineffective assistance of counsel. Therefore, Appellant is entitled to no relief on this alleged statement of error.

10. "Counsel failed to object during trial and preserve for appeal an introduction of hearsay testimony that was used to describe his client as a shooter."

It appears that by raising this issue Appellant is attempting to assert an ineffective assistance of counsel claim as against his trial counsel. However, Appellant raises this issue for the first time in this appeal. Appellant plainly states herein that trial counsel did not raise this claim during trial. Further, this claim was not raised and preserved in a post-trial motion, either directly or in the context of an ineffectiveness claim. This issue was not raised and preserved in the original PCRA Petition or in the Amended PCRA Petition, and therefore, it cannot be raised for the first time on appeal. *See*

---

[19] We believe Appellant is referring to issues numbered 5 and 8 raised herein, which are that his sixth amendment confrontation clause rights were violated because this Court failed to allow cross examination of Mr. Sandt and that this Court failed to grant a mistrial due to remarks made during the prosecutor's closing statement regarding certain "infamous crimes."

*Commonwealth* v. *Ford*, 44 A.3d 1190, 1201 (Pa. Super. 2012) (holding that claims of PCRA counsel ineffectiveness cannot be raised for the first time after a notice of appeal has been taken from the underlying PCRA matter). Because this issue was not raised previously, it is waived.[20]

Even if this claim were not deemed waived for failure to raise it previously, it is waived because Appellant does not develop this issue in his 1925(b) Statement such that we are appropriately able to address same. Pa.R.A.P. 1925(b)(4)(ii) provides that an appellant's statement of matters complained of on appeal must "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(vii) provides that all issues not raised in accordance with subsection (b) of this rule are waived. Here, the trial testimony was voluminous, and Appellant's Concise Statement of Matters simply references testimony describing him as a "shooter." We are unclear as to what testimony Appellant is referring, and because Appellant failed to develop this contention in any more detail, this issue is waived.

## IV.    Conclusion

Based on the foregoing analysis, Appellant's appeal should be denied, and the final Order dated January 27, 2021, dismissing Appellant's PCRA Petition should be affirmed.

BY THE COURT,

JENNIFER R. SLETVOLD, JUDGE

DATE: 4/30/21

---

[20] We also note that to the extent Appellate is asserting ineffectiveness against his appellate counsel regarding this issue, we submit that appellate counsel cannot be deemed ineffective for failing to raise claims that were defaulted below. *See Commonwealth* v. *Fletcher*, 604 Pa. 493, 555, 986 A.2d 759, 797 (2009).